ELIZABETH L. GARMONG *vs.* JOHN B. HENDERSON.

Penobscot. Opinion October 6, 1915.

*Accusing another man with seduction during the engagement with defendant.*
*Breach of contract of Marriage.   Conflicting Evidence.*
*Contract of Marriage.   Promise of Marriage.*
*Unchastity of Plaintiff with another man.*

1.  The unchastity of the plaintiff in a suit for breach of promise of marriage with another man prior to or during an engagement of marriage with the defendant is a bar to the suit, unless at the time he made or renewed the promise of marriage relied upon, he knew or had been informed of her unchastity.

2.  It being admitted that the plaintiff in an action for breach of promise of marriage, pending an engagement of marriage with the defendant, made accusations on oath in court charging another man with seduction during the period of the engagement and with the paternity of her unborn child, such accusations constitute a bar to the suit, unless the defendant after knowledge that the accusations had been made, made or renewed a promise of marriage. It is immaterial whether the accusations were true or false. Even if false, the making of such accusations was such conduct on her part as tended necessarily to destroy the confidence essential to connubial happiness, and to defeat the great purpose of the marriage relation. It released the defendant from the obligation of any promise he had made.

3.  On a motion for a new trial on the ground that the verdict is against the evidence, if the evidence is conflicting, the court will not disturb the verdict, if it is found to be supported by evidence, credible, reasonable, and consistent with the circumstances and probabilities of the case so as to afford a fair presumption of its truth.

4. A verdict will be set aside as against the evidence, when it is not such as reasonable minds are warranted in believing, as when it is incredible or unreasonable, or inconsistent with the proved circumstances of the case, or when the evidence to the contrary of the verdict is so overweighing as to induce the belief that the jury were led into mistake, or were so moved by passion or prejudice as not to give due consideration and effect to all the evidence.

5. In this case, giving to the plaintiff such degree of credibility as her own statements entitle her to, the court are of opinion that her practically unsupported testimony is so overborne by proved circumstances, by her obvious disregard of the sanctity of an oath, by her own inconsistent conduct, by the mutual conduct of both, by the testimony, contradictory to hers, of witnesses apparently reputable, disinterested and credible, and by the probabilities of the case, inconsistent with her claim, as to induce the belief that the jury either did not sufficiently weigh all of the evidence in the case, or were influenced by sympathy, passion or prejudice.

On motion for new trial by the defendant. Motion for a new trial sustained.

This is an action of assumpsit brought by the plaintiff to recover damages of the defendant for a breach of a promise of marriage, alleged to have been made by defendant to the plaintiff. The defendant pleaded the general issue. The jury returned a verdict for the plaintiff. Defendant filed a general motion for a new trial.

The case is stated in the opinion.

*John B. Merrill and Creed M. Fulton,* for plaintiff.

*L. B. Deasy, and Fellows & Fellows,* for defendant.

SITTING: SAVAGE, C. J., SPEAR, KING, BIRD, HALEY, HANSON, JJ.

SAVAGE, C. J. This is an action for breach of promise of marriage. The plaintiff recovered a verdict for $116,000. The case comes before this court on the defendant's motion for a new trial. The plaintiff in her writ alleged a promise on March 10, 1910, and another on November 6, 1910. And she testified that such promises were made. The defendant denies that he ever promised the plaintiff to marry her. And further he pleads, and relies upon as a bar, the unchastity of the plaintiff prior to the date of the first alleged promise, and between that date and the date of the second alleged promise; and that, pending the first alleged promise, she began two

criminal proceedings against one Roscoe D. Smith, one before a justice court in Iowa, and another before a grand jury, wherein she charged upon oath that she had been seduced by Smith under promise of marriage, during the period between the two alleged promises. The evidence is voluminous. The extent of it precludes any attempt to analyze it minutely in an opinion. It will suffice to state only the substance of so much of it as seems to be material and important.

The plaintiff is a native of Iowa. There, in school, she became acquainted with Roscoe D. Smith. He became her lover, and they were engaged to be married. In 1907 she came to Baltimore to pursue medical studies. The defendant was and is a resident of Washington, D. C. In 1909, when their story began, he was a widower with one child. At that time they were respectively about 29 and 39 years of age. In June or July, 1909, they casually met at a gentleman's residence near Washington where she was visiting. On that occasion he took her on a short automobile ride. A day or two later he called at the residence of her aunt in Washington, where she had informed him by telephone she was staying, and left for her a medical book which they had talked about at their first interview; but he did not then see her. About that time she says he took her on an automobile ride in and about Washington, during which he told her that he loved her, that he was coming to Bar Harbor, and that he urged her to visit him at Bar Harbor. This he denies. But at any rate, in July she came to Bar Harbor without informing him that she was coming. After getting there she notified him by telephone of her presence, and within a day or two he called upon her at her boarding place. They were in each other's company more or less for several weeks. They disagree as to the times of meeting, and the extent and nature of the acquaintance. But it is not questioned that he took her to ride one or more times, that they walked together, and that once or twice they went sailing in his motorboat. She says that he caressed and kissed her, and talked love to her. This he denies. At one time she was accused of larceny. She referred to him as her friend, and he was sent for. The property alleged to have been stolen was subsequently found in a room adjoining hers, and the matter dropped. He gave her money for her expenses. She says it was a loan. He says she asked for a loan

large enough to cover the expense of going to Des Moines, Iowa, where her parents lived. He ascertained the probable expense, and let her have the money. After leaving Bar Harbor she went first to Scranton, and then, three weeks later, to Philadelphia, where she remained four or five months, serving as nurse for an old gentleman who was ill. During that time she says that she visited the defendant three or four times in Washington at his suggestion and at his expense, being with him at various places, and that he called upon her once in Philadelphia. In February, 1910, she went to Washington, and lived for a time at her aunt's house. On several occasions the parties met. They rode together in his car, and dined together at one or more hotels. At one time they went to Baltimore in each other's company, returning the same night. In March, she says the defendant definitely promised to marry her sometime during that year. This he denies.

About the first of April, 1910, the plaintiff went to Des Moines. She soon met Roscoe D. Smith. On July 6. she made complaint on oath in a criminal proceeding against Smith, alleging that "on or about June 15, 1910 and 4th of July, 1910," he had seduced her under promise of marriage. Smith was arrested and put into jail. She did not appear on the day set for hearing the criminal proceeding, and prosecuted that no further. About the same time she began a civil suit against Smith for breach of promise of marriage, with an allegation of seduction. Attempts were made by Smith and his father to settle the civil suit, liability in which does not seem to have been denied. The witnesses say that a certain considerable sum of money was agreed upon for a settlement, but that she refused to sign a receipt or release, and so the settlement fell through. She admits being at meetings where attempts were made for a settlement. We think the overwhelming weight of the evidence compels the finding that she did agree to settle for a definite amount. Though she refused to sign a release, she still insisted that Smith was the father of her unborn child, and that he would have to take care of her and it. Upon the failure of the settlement she even attempted to get into the wagon of the elder Smith to go home with him for the avowed purpose of being taken care of. But an officer was called, and she was prevented. In the meantime, she wrote to the defendant informing him that she was in the family way, and asking for help.

Replying, July 16, he offered advice and financial aid, which latter he subsequently furnished to the extent of $100.

On September 21, 1910, the plaintiff appeared before a grand jury in Iowa, and testified on oath that she had been engaged to marry Roscoe D. Smith, that he had had sexual intercouse with her soon after the first of April in that year, that she was in the family way by him, that she had submitted to the intercourse on the strength of his promise to marry her, that she had asked him to fulfil his promise, and that he had said he would go to the penitentiary first. Upon this testimony, in November the grand jury returned an indictment, against Smith for seduction. It does not appear that he was ever put upon trial.

The plaintiff returned to Washington the very last of October, 1910, and on November 6, she had an interview with the defendant at Hotel Driscoll, where she was staying. She charged him with the paternity of her child and she says that she told him that in order to protect him from any violence she had brought suit against one of her friends who had seduced a nurse at the hospital, that he, the defendant, expressed himself as under great obligation to her, and that they then and there agreed to be married sometime in the earlier part of the next year, the date not being then definitely fixed. Two days later she gave birth to a child at a hospital to which she had gone under an assumed name. The defendant visited her at the hospital one or more times, and she says gave her fruit and flowers. Afterwards they met, once in a hotel parlor, and at other times by appointment at various points on the streets of Washington. After the birth of the child and prior to March, 1911, he gave her about $900 in money. The defendant denies any promise of marriage after she returned from Iowa. He denies that she told him her proceedings against Smith in the criminal courts. He says that before that time he knew that she had brought a civil suit against Smith, or contemplated doing so. He says the meeting on November 6 was a stormy one, that she charged him with being the father of her child, and said that he would have to take care of her and take care of it, and that afterwards at one time she threatened to take the child to his father's house where he lived and leave it on the doorsteps. He says that his meetings with her after November 6, and his payments of money to her, were for the purpose of buying his peace, arrang-

ing a settlement with her, and avoiding a public scandal, and that she did at one time agree to settle for $900 in four instalments, one of which he paid.

The plaintiff says that shortly before the first of March, 1911, the defendant announced that the engagement was off. In April or May she followed him to Bar Harbor, and had an interview with him. She says that afterwards he telephoned her that she should have no more money from him, and that he would have nothing more to do with her. Soon after she brought proceedings in bastardy against him. A trial was had. We . gather from certain inquiries made of witnesses by her counsel that the result of the trial was adverse to her. This suit followed. We have thus outlined the history of this case. We have omitted many details not without significance. There is much conflict between her testimony and that of the defendant and his witnesses, not only as to vital points, but as to details.

In considering a motion for a new trial on the ground that the verdict is against evidence it is not the province of the court to weigh the evidence for the purpose of determining the preponderance of it between the parties. That is the province of the jury. Where the evidence is conflicting, a verdict will not be disturbed, if it is found to be supported by evidence, credible, reasonable, and consistent with the circumstances and probabilities of the case, so as to afford a fair presumption of its truth, even though it may seem to the court that the evidence as a whole preponderates against the finding of the jury. A verdict will be set aside as against the evidence supporting it when the evidence is not such as reasonable minds are warranted in believing, as when it is incredible, or unreasonable, or inconsistent with the proved circumstances of the case; or when the evidence to the contrary of the verdict is so overweighing and so overwhelming as to induce the belief that the jury were led into mistake, or were so moved by passion or prejudice as not to give due consideration and effect to all the evidence.

Before considering the force and value of the evidence it is proper briefly to discuss certain features which bear upon the credibility of the parties themselves. At the outset, the burden was upon the plaintiff to establish a valid contract for marriage, subsisting up to the time of the alleged breach. The proof of such a contract, as the

record shows, comes almost entirely from the plaintiff's own lips. But she admits, or rather it is her avowed contention, that in the two court proceedings in Iowa in 1910 she deliberately swore falsely, and stated as facts matters that had absolutely no existence. And the only kind of a moral justification which she suggests for her false oath and perjury is that she did not raise her hand "very high" when she was sworn, and didn't call it an oath." She excuses her proceedings by saying that her purpose was, not to protect the defendant from scandal, but to protect him from the violence of her family, as she expected him to come there and marry her; and also to compel Smith to marry the nurse whom she says he had seduced.

A little reflection will show how utterly flimsical and baseless these reasons are. They are unbelievable. If she had reason to expect that the defendant was going to Iowa to marry her, what reason could she have for expecting him to marry her after he should have reached there, and learned that she had made her shame public by swearing the paternity of her unborn child upon another man? And if he would be willing then to marry her, what reason could she have for thinking that her family would inflict violence upon a man who had come to cover her disgrace as far as it could be done, and to give her child a name, by marrying her? And how could she suppose that she could force Smith, her former lover, to marry the nurse by falsely charging him with seducing herself? What inducement could it be to him to marry another woman, for this woman falsely (as upon her theory he would have known it to be) to charge upon him the paternity of another man's child? It is contrary to all experience, and to human nature itself, for a woman to bring such a charge against a man to force him to marry another woman. Had the plaintiff testified that she brought these charges against the former lover, Smith, to force him to marry her, that would be believable. It cannot reasonably be conceived otherwise than that these excuses are forged, and clumsily forged, by the plaintiff to meet the exigencies of the situation. It must be regarded as self evident that a woman such as the plaintiff describes herself to be with respect to the Iowa court proceedings, has little or no regard for the sanctity of an oath, and its binding obligation to tell the truth. It is equally evident that the plaintiff either was a perjurer in Iowa, or is one now. Such moral callousness reaches and undermines the very

groundwork of judicial decision. "What ground of judicial belief," asked Judge Story, "can there be left when the party has shown such gross insensibility to the difference between right and wrong, between truth and falsehood?" The Santissima Trinidad, 7 Wheat., 283.

On the other hand, it must be said with equal plainness that the jury were undoubtedly warranted in believing either that the defendant was in reality the father of the plaintiff's child, or that he had reason to believe that he was; and that he swore falsely when he testified that he never had had illicit relations with her. Although neither party swears to it, the greatly preponderating effect of the evidence, weighed in the light of their conduct, would warrant a finding that they were unduly intimate from nearly the beginning of their acquaintance. And of this it is probable that the jury took full account.

We are now in position to examine the evidence respecting the alleged promises of marriage. And first the promise in March, 1910. The proof of that promise in terms comes from the plaintiff alone. As a premise to that promise the plaintiff says that love making on the defendant's part began in Washington and was continued in Bar Harbor in July and August, 1909, that the defendant persuaded her to leave her medical studies, told her she would not need them, and told her that he expected to make her his wife. This is denied. We do not say that as between the differing testimony of the parties themselves, her statement might not be taken as the true one. He was certainly showing her some attention of some kind. But the after conduct of the parties, and particularly their correspondence, fails to corroborate the plaintiff, but is indicative rather that there was no engagement of marriage, nor contemplated engagement. They corresponded pleasantly from time to time, from August, 1909, to March, 1910. In the first three weeks after she left Bar Harbor, the "ardent wooer," as she says he was, wrote to her once, and then to excuse the non-fulfilment of an appointment. In all nine letters or empty envelopes of his were introduced by the plaintiff, which were written within the period named. In the letters he addresses her as "My dear Miss Garmong," and signed himself "Sincerely yours." There is not one word of love or sentiment in any degree in any of these letters. There is not one word

about engagement or marriage. There is not one word which indicates any intimate relation whatever between them. They are such letters as any gentleman might write to a pleasant lady acquaintance. It does not appear that she ever complained to him that the tone of his letters was any different from what she had reason to expect. It is quite singular in view of the plaintiff's description of the defendant's attitude to her, that not one written word of his remains which has any tendency to show a lover's affection for her.

The plaintiff says, indeed, that she had other and tenderer letters from him which she has destroyed. It is difficult to believe that a woman would voluntarily destroy the letters expressing the affection of her lover and the hopes of their future marriage, and at the same time preserve and retain only those which possessed no significance, the mere platitudes of good fellowship. And the inquiring mind asks, why were there two kinds of letters, so dissimilar? If there were other letters, letters of another kind, warm letters, affectionate letters, such letters as she suggests they were, interspersed among those which have been kept and produced, they must have been curious oases of love in a desert of platonic friendship.

She was five months in Philadelphia. During that time he called upon her once, he living in the midst of affluence in Washington, and she whom he expected to make his wife, as she swears he told her, earning her living in Philadelphia, as a nurse. And when she visited Washington three or four times at his instance, and while she was in Washington afterwards, she did not go to his house. He apparently did not call upon her at the home of her aunt except to take her from there to go to other places. She says they went where they could be alone with each other. He showed her no public attention. Weighing both her affirmation and his denial in the light of their conduct, and imputing to each the degree of credibility which we think is deserved, we feel bound to say that the evidence does not support her contention that they were avowed lovers in anticipation of marriage from the Bar Harbor meetings up until the next March.

The next period is from March to November, 1910, during all of which time she says they were under an express and formal engagement to marry. This is the period during which she sued Smith for

breach of promise of marriage, and prosecuted him criminally in two courts for seduction. We have already discussed the reason she gives for the prosecutions,—reasons without reason. In view of the unreasonableness of her reasons, is it not altogether improbable and unreasonable that she would have commenced these prosecutions, and also have sued Smith in a civil action for breach of promise of marriage, if at the time she believed that she was engaged to the defendant, and expected him to marry her that year? It would seem so, unless in fact her charges against Smith were true, which she denies.

So far as correspondence is concerned, what has been said respecting the former period applies as well to this. He still addressed her as "My dear Miss Garmong," or "My dear Miss G," and signed himself as formerly, "Sincerely yours." In all of these letters so far as they appear in the record, (and there are only five which she has preserved) there is no word of sentiment. She was in Iowa, and she says she expected him to come there to marry her. Yet nothing in these letters, at least, affords the slightest ground for such an expectation. Indeed, in them all there is no suggestion of any intimate relation between them, proper or improper, except that in September he wrote, "it seems inevitable that I eventually shall be held to blame owing to our acquaintance, and that Bar Harbor trip you took;" and except such inferences as may be drawn from the letter of July 16, in which he advised her, and promised to send money to her after she had written to him that she was in a delicate condition. In a letter of July 11, apparently the last one before she disclosed her condition to him, he addressed her as "My dear Miss Garmong," congratulated her on her success as a lecturer, about which she had written to him, and closed by saying *"If you write,* please address me, 'Care of Reading Room, Bar H.'" The italicizing is ours. And these are letters, it is claimed, from an affianced husband to a betrothed wife, under an engagement which she says sprang from mutual love, and written when, prior to her July letter, he had no motive to conceal his sentiments from her, at least.

He did not see her during this period. He was once at St. Louis, but he did not go to Iowa. She says she was expecting him constantly. After she returned to Washington, the last of October, she

did not see him until November 6, and there is no suggestion that he was not in Washington during that time. If the plaintiff's right of recovery depended upon proof of the promise alleged to have been made in March, 1910, we should have to say that the evidence of the conduct of both parties, all of the evidence, except her own unsupported word, is wholly inconsistent with the theory that a contract for marriage was subsisting between them.

But in the end, whether such a contract had been made, or not, is not so very important. It is important only as it bears upon the probability or improbability that a new contract was made, or an old one renewed, in November. We say it is relatively unimportant because of the legal aspect of certain features now to be considered upon which our judgment must rest.

The defendant contends that the plaintiff was unchaste with other men, before the time of any alleged promise on his part. He also contends that during the pendency of the March contract, if contract there was, she was unchaste with Smith, and that she published her unchasity to the world by her sworn complaint in the justice court, by her testimony on oath before a grand jury, and by her declarations to divers persons out of court, to say nothing of her civil suit against Smith for breach of promise of marriage. If the plaintiff was unchaste with another man prior to or during any engagement of marriage with the defendant, it is a bar to this suit, unless at the time he made or renewed a promise of marriage, now relied upon, he knew or had been informed of her unchasity. The authorities all agree that the unchastity of a woman before or pending a promise of marriage, if unknown, and if the promise be not renewed after knowledge, legally justifies a man in the breach of any promise. The presumed chastity of the woman is one of the essential elements of a contract for marriage. A man may assume that the woman he promises to marry is chaste, and if he enters upon an engagement upon that assumption, and afterwards discovers that she has been unchaste, he will not be bound by his promise. *Berry* v. *Bakeman,* 44 Maine, 164; *Snowman* v. *Wardwell,* 32 Maine, 275; *Foster* v. *Hanchett,* 68 Vt., 321; *McKane* v. *Howard,* 202 N. Y., 181. See also, authorities collected in note to *Van Houten* v. *Morse,* 26 L. R. A., 430.

So the sworn accusations against Smith afforded the defendant ample justification for the breach of any promise he had made previously, and constitute a bar to this suit, unless the defendant after knowledge that the accusations had been made, made or renewed a promise. And it is immaterial in this respect whether the accusations were true or false. If true, they bring the case within the principle just now stated. If false, the making of the accusations was such conduct on her part as tended necessarily to destroy the confidence essential to connubial happiness, and to defeat the great purposes of the marriage relation. It struck at the foundation of marital confidence. *Berry* v. *Bakeman,* 44 Maine, 164.

With regard to the contention that the plaintiff was unchaste prior to the making of any alleged promise, the defendant chiefly relies upon the testimony of Smith, who testifies that he seduced her. The plaintiff denies it. If true, there is no pretense that the defendant ever knew it. Without corroboration it may well be that Smith's testimony, under the circumstances, should not outweigh the plaintiff's. But we think there is significant corroboration. First, there is the great improbability that she would have made such a charge against a man who had been her friend and lover, and who up to that time apparently had continued to be on friendly terms with her, unless he had at some time been sexually intimate with her. Then, in a letter from her to him, written June 20, 1908, after asking him to visit her in August, she used language somewhat obscure or veiled, which we are unable to interpret otherwise than as signifying that undue sexual intimacy had existed between them. The language referred to is this: "Thanks for your compliments, dearest, but so far I've had none of that cheap love you once spoke of, and those other elements only belong to the highest attributes of womanhood. The fact that you have owned forsaken love is sufficient. If I may ask of you faithfulness and on the contrary to mine it is untrue, may I then use the limit of my nerve power to satisfy the longing for you with another in your absence. Will await an answer. Then with your permission will not feel deceitful, but you won't let me, will you, but I *must.* August is too far away."

The claim that she was unchaste with Smith in Iowa in 1910, rests upon her sworn complaint that he had sexual intercourse with her "on or about June 15 and the 4th of July," her testimony before the

grand jury that he had such intercourse with her "soon after" the first of April that year, and her declarations made to Smith and to four or five others in Iowa, in Washington and in Maine. The witnesses testifying to such declaration seem to be reputable and disinterested. None of them, except possibly Smith, who it is urged, is seeking revenge, apparently has any motive to swear falsely. Their testimony, we think, shows internal evidence of truth. In addition, it is true we think beyond reasonable doubt that she attempted to get money from Smith or his father on account of the alleged paternity of her unborn child, and, the settlement failing, threatened to throw herself on them for support. If she was unchaste with Smith in April, or June, or July, there is no claim that the defendant was ever informed of it. She denies making the unsworn declarations. She claims that the sworn statements were perjuries on her part. That she made the sworn statements that Smith had seduced her in 1910 is not in dispute. If she told the defendant that she had made them, and then with that knowledge he promised to marry her, no reason is shown why he should not answer for the breach of that promise. But if she did not tell him, and he did not know of these accusations against Smith, he was justified upon discovery in breaking any promise he then made to her. And as we have already said, her conduct in this particular had released him from the binding obligation of any promise he had previously made.

Did she tell him? And did he thereafter promise? In her direct examination she says only that she told him that in order to protect him from any violence, she had brought a suit against one of her friends who had seduced a young nurse. On re-direct examination, her counsel asked her if she had told the defendant fully what she had charged Smith with, and why. She answered, "Yes, sir." Later on she said "I told him of the whole situation, just what I had done in the west. Then we discussed our plans for the child's future, and we also discussed our home and our marriage." She was asked on re-cross examination to state all that she had remembered of the substance of what she told the defendant, and answered, "I said to him that I had protected him by holding another man responsible, a former sweetheart of mine, for my condition." She was pressed to state any other details that she could remember of what she told

the defendant in this regard, and she professed that she could remember nothing more. Under the circumstances, the burden was strongly upon her to show that she told him fully and particularly what she had done. If the particulars she gives were all that she told the defendant, they fell far short of the whole truth which he was entitled to know. He was entitled to know, not alone that she had "sued" Smith, and had "held another man responsible," but also that she had prosecuted Smith criminally in the Justice court for seducing her that year, and that she had been the complaining witness before the grand jury on the same charge against him. Did she tell the defendant these particulars? Did she tell him that in the attempt of Smith to settle with her she had charged him with the paternity of her unborn child in the presence of divers persons? He denies it.

If we assume that she did tell him, did he thereupon renew a promise of marriage? She says he did, and with expressions of gratitude and affection. He says he did not. When we consider all the circumstances surrounding these two people, such a proposition on the face of it seems innately improbable, and well nigh incredible. And yet it must be granted it is not impossible. If there were no further light, we might say that a jury might be warranted in believing even so improbable a story. But in our judgment the after conduct of the parties is inconsistent with her claim. Although her accouchement as it turned out was only two days distant, it would seem that the defendant took no part in the arrangements for the expected illness of his betrothed wife. It may be easily understood that he might not at that time wish to appear very prominently in the matter. But she testifies only that he agreed to follow her on to New York where the child was expected to be born, and to provide her with money. The child was in fact born at a hospital in Washington. He visited her in the hospital. They disagree as to the number of times. He paid her money from time to time. They were both in Washington all that winter, but after November they did not dine together as they had done before. They did not ride together as they had done before, except in the evening, and then he did not call for her at her boarding place, but took her at some place on the streets which they had previously agreed upon. They had meetings by appointment under the shade

of evening, at divers places on the public streets, and once in a hotel parlor. There is no evidence that he called upon her after she left the hospital. He wrote her no affectionate letters, but merely notes making appointments. Yet she says that during all this time he continued to be affectionate, and that at their meetings they pleasantly discussed their future life as man and wife, and the nurture of their child, whose existence he desired should be unknown for the time being. He says that she held over him the imminent danger of public scandal and threatened to leave the child upon his father's doorsteps. He says the meetings with her were had in an endeavor on his part to reach a pecuniary settlement with her, and that he paid money to her to prevent publicity. Surely it may be said that the conduct of these parties was not as consistent with her claim of their continued affectionate relations in the expectation of marriage as it was with another relation which he might have supposed that he bore to her. Discussion of details cannot make it plainer. Even if she were not self-impeached, the probabilities would seem to be against the truthfulness of her contention.

But finally, and perhaps more significant than all the rest, is the fact that the plaintiff, who says that she was engaged to the defendant until the first of March, 1911, and that they had continued on terms of mutual affection, followed him to Maine, after the alleged breach, and began, not a suit for breach of promise of marriage, but a prosecution against him for bastardy. It was a most unlikely election on her part. If she then thought that he had promised to marry her, and had broken his promise, is it within any bounds of likelihood that she would have resorted to a remedy for bastardy, in which the damages recoverable would relate only to the expense of supporting her child, instead of pursuing the more ample one for a breach of promise to marry in which she might expect to recover large damages for pecuniary loss, and wounded sensibilities, enhanced by the fact of his seduction, if she had chosen to allege it? We think not. Such is not human nature. Such is not the course that would be pursued by an unjustly discarded woman against her faithless lover who had been affianced to her.

We have omitted many minor considerations not without significance. We have omitted for the most part consideration of the particulars of the defendant's testimony. As must be done on a

defendant's motion for a new trial, we have examined the record from the viewpoint of the plaintiff's testimony, to see if it is sufficiently credible to sustain the verdict, when weighed in connection with the circumstances of the case, which we think should be regarded as proved. We do not say that there is no evidence to sustain the verdict in this case, for the plaintiff has testified. But we do say that upon the whole record, giving to the plaintiff such degree of credibility as her own statements entitle her to, her practically unsupported testimony is so overborne by proved circumstances, by her obvious disregard either here or in Iowa, of the sanctity of an oath, by her own inconsistent conduct, by the mutual conduct of both, by the testimony, contradictory to hers, of witnesses apparently reputable, disinterested and credible, and by the probabilities of the case inconsistent with her claim, as to induce the belief that the jury either did not sufficiently weigh all of the facts of the case, or were influenced by sympathy, passion or prejudice. Even the amount of damages awarded, considering all the circumstances, furnishes manifest evidence that the real merits of the case have not been properly passed upon by the jury. *Hill* v. *Jones,* 109 Minn., 370. We do not think we would be justified in accepting the verdict as the basis of judgment. *Rovinski* v. *Northern Assurance Co.,* 100 Maine, 112. Justice requires that it be set aside.

*Motion for a new trial sustained.*