LUCILLE R. JORDAN
*vs.*
PORTLAND COACH CO.

Cumberland. Opinion, July 13, 1954.

*Basil Latty,* for plaintiff.

*Berman, Berman & Wernick,* for defendant.

SITTING: FELLOWS, C. J., WILLIAMSON, TIRRELL, WEBBER, BELIVEAU, TAPLEY, JJ.

WEBBER, J. Plaintiff makes claim for personal injuries alleged to have been caused when she was struck by defendant's bus from which she had just alighted as a passenger. At the close of the evidence defendant's motion for a directed verdict was denied and exceptions thereto are before us.

We view the evidence in the light most favorable to the plaintiff to determine whether the matter was properly submitted to the jury to determine controverted facts and to draw any reasonable and legal inferences therefrom. *Greene, Admr.* v. *Willey,* 147 Me. 227. A verdict is properly directed for a defendant when the evidence tending to support a verdict for the plaintiff is not such as reasonable minds are warranted in believing, as when it is incredible, or unreasonable, or inconsistent with the proved circumstances of the case, or when the evidence contrary to the plaintiff's position is so overweighing and so overwhelming as to make it appear that the jury could not reasonably and rationally find a verdict in favor of the plaintiff. *Garmong* v. *Henderson,* 114 Me. 75. In such cases prevention by direction of the verdict is better than the cure. *Sylvia* v. *Etscovitz,* 135 Me. 80; *Weed* v. *Clark,* 118 Me. 466.

In order to justify submission to a jury, plaintiff's right to recovery must be supported by more than a mere scintilla of evidence. "That a scintilla of evidence will not support a verdict was long since declared in this court, in decisions still of authoritative force." *Bernstein* v. *Carmichael,* 146 Me. 446 at 450. " 'It is not enough to say there was *some* evidence. A scintilla of evidence, or a mere surmise that there may have been negligence on the part of the defendants, clearly would not justify the judge in leaving the case to the jury. There must be evidence on which

the jury might reasonably and properly conclude that there was negligence.' " *Beaulieu* v. *Portland Co.*, 48 Me. 291, at 296. Mere surmise or conjecture will not warrant submission of a plaintiff's claim to a jury. When it is sought to establish a case upon inferences drawn from facts, it must be from facts proven. A jury is entitled to draw all inferences that are reasonable and proper from such evidence. That they are limited to such inferences is undoubted. Inferences based on mere conjecture or probabilities will not support a verdict. *Bernstein* v. *Carmichael*, *supra.*

The mere fact that a plaintiff may have offered some testimony in support of his claim will not in every case warrant submission of the cause to a jury. The language used at page 90 of *Garmong* v. *Henderson, supra,* only slightly paraphrased, has application here. "We have examined the record from the viewpoint of the plaintiff's testimony, to see if it is sufficiently credible to sustain the verdict, when weighed in connection with the circumstances of the case, which we think should be regarded as proved. We do not say that there is no evidence to sustain (a verdict for the plaintiff), for the plaintiff has testified. But we do say that upon the whole record, giving to the plaintiff such degree of credibility as her own statements entitle her to, her practically unsupported testimony is so overborne by proved circumstances, * * * * * by the testimony, contradictory to hers, of witnesses apparently reputable, disinterested and credible, and by the probabilities of the case inconsistent with her claim, as to induce the belief (that a verdict for plaintiff could not be supported)." In *Raymond* v. *Eldred,* 127 Me. 11 at 13, our court said: "The testimony of interested parties, contrary to facts otherwise conclusively established and contrary to all reasonable inferences to be deduced from the situation disclosed by the evidence, does not raise a conflict even requir-

ing a finding by the jury." And in *Moulton* v. *Railway Co.*, 99 Me. 508 at 509, we said: "But a conflict of testimony cannot be said to arise simply because one witness testifies contrary to another. If it was so held hardly a verdict could ever be set aside. It would be difficult to imagine a case that had been dignified with the verdict of a jury that would not present some conflict of testimony. Besides if such were the rule it would only be necessary to secure the evidence of a witness, however false, to hold a verdict once obtained. The rule cannot be so construed. It means that there must be substantial evidence in support of the verdict,—evidence that is reasonable and coherent and so consistent with the circumstances and probabilities in the case as to raise a fair presumption of its truth when weighed against the opposing evidence. When it is overwhelmed by the opposing evidence a verdict cannot stand."

As to the circumstances of this accident, the plaintiff is the only witness in her own behalf. Arrayed against her are the driver of the bus whose interest in the case is recognized, and three passengers who, as far as the record shows, are completely disinterested witnesses. Plaintiff boarded defendant's bus on a midwinter evening and rode for some distance along city streets as a passenger. By her own admission she had spent the previous two hours in cocktail lounges drinking with her father. She acknowledges having had three cocktails during that period. Her condition as to sobriety and her unsteadiness on her feet were obvious to the driver and to the passenger witnesses both when she boarded the bus and when she alighted. She pulled the cord to stop the bus when she was still approximately two miles from her destination in the mistaken belief that she had arrived at her destination. The driver drew over somewhat nearer to the right hand side of the street and brought the bus to a stop in such a position that the exit door, located on the right side of the bus at the

front, was at or near the location of the regular bus stop. The plaintiff walked to the front of the bus, paid her fare and alighted. She walked directly away from the door of the bus toward the sidewalk and then turned and stood, as she testified, waiting for the bus to move past her and intending to go behind it and cross the street after it had moved on. The driver obviously had a duty not to start the bus until his passenger had safely alighted and had moved far enough away from the bus toward a position of safety so that he could safely proceed past her, and he had a further duty not to steer the bus so sharply to its right that it would move toward the position taken up by the plaintiff and strike her. He had a further duty not to apply the power carelessly and improperly to the rear wheels in such manner as negligently to induce a skid of the bus to its right and toward the position taken up by the passenger. The driver, however, in the exercise of ordinary care, having observed the plaintiff move away from his bus toward the sidewalk to a place of apparent safety, had a right to anticipate that the plaintiff would not thereafter, while the bus was in the act of passing her, abandon her safe position for one perilously close to the moving bus. He had a right to assume that the plaintiff, who had just left his bus and was well aware of its immediate proximity, would exercise ordinary and reasonable care for her own safety while the bus was being started and moved ahead.

On the other hand, the plaintiff, having alighted and become a pedestrian in the street, owed a duty of care for her own protection. Knowing that the bus might be expected to start and move past her, she owed a duty after alighting to move away from the bus and its course of travel and to leave a sufficiently safe distance between herself and the bus to permit the bus to start and pass her without danger to herself. The record is devoid of any evidence that at the outset either the plaintiff or the defendant's driver failed in

any of these duties. The plaintiff moved toward the sidewalk from the bus door to what she obviously considered was a safe distance, and there is no suggestion that the bus was started until she had taken up a position several feet from the door. The plaintiff herself did not attempt to estimate this distance, but the shortest distance estimated by any witness who observed her was three feet, which obviously would provide an adequate margin of clearance. The driver then closed the doors and started the bus ahead slowly. There is no evidence of any sudden or unnecessary excess application of power such as might induce a skid or, in fact, of any skidding whatsoever. The bus was then proceeding on Woodfords Street and its regular route would require that it continue straight ahead along Woodfords Street from the point where it was stopped. It would reasonably be expected that the bus would be following nearly a straight course along Woodfords Street as it passed the waiting plaintiff or, if deviating at all from a straight course, that it might be veering slightly to the left to enter the regular course of traffic along its right side of Woodfords Street. All of the credible evidence points conclusively to the fact that this is exactly what took place. Any sudden and unusual veering of the bus either sharply to the right or to the left would have taken the bus away from the direction of its intended route and would have been most unnecessary and uncalled for. Moreover, such an unexpected deviation from the course of travel would have been noted by the passengers, but the passengers noted nothing unusual or irregular as the bus started and pulled slowly past the plaintiff, who was still observed by the passenger witnesses standing and waiting as the bus went by.

Upon the evidence in the record, as to what happened thereafter we can only surmise and conjecture. The bus had only proceeded approximately once and a half its own length along Woodfords Street when passengers in the

rear of the bus observed that the plaintiff was lying in the street. The bus was immediately stopped and the driver returned to find the plaintiff lying unconscious in the street. Testimony by the driver that the track marks of the bus ran practically straight from the point where the bus was started is entirely consistent with the testimony of the disinterested passengers as to its course of travel and as to its location on Woodfords Street where it stopped after the plaintiff had fallen. The plaintiff herself is unable to suggest any reasonable explanation as to how the bus could strike her if, as she maintains, she remained in her position of apparent safety until the bus had completely passed. She testified as follows:

"Q. Now, as the bus started up what did you see?
A. It started to go by and I saw it sway towards me and then I screeched.
Q. Then what happened?
A. I don't know what happened after that.
Q. You were rendered unconscious?
A. Unconscious, yes.
Q. Do you know what rendered you unconscious?
A. I suppose when the bus hit I went down."

This last answer on request was ordered stricken by the court and we refer to it only because it indicates that even the plaintiff could only conjecture what might have happened.

And later:

"Q. You say as the bus started up you saw it approaching you? The side of the bus was it?
A. Yes.
Q. What did you do then?
A. I screeched.
Q. What happened after that?
A. All I can remember is a big cold blast of wind.

Q. You say you screeched and you saw the bus,
the side of the bus approaching you, getting
close to you?
A. That is right.

Q. About the side of the bus, what did you next
feel or see?
A. I just felt a gust of wind, the impact.

Q. Do you recall being knocked down?
A. All I can remember the last of it was that
impact and then I felt myself falling and it is
all I can remember."

Plaintiff described her injuries as a big lump on the back of her head and a broken ankle. Other testimony of the plaintiff adduced nothing helpful in further explanation of what actually occurred.

Upon this, the evidence most favorable to the plaintiff, it is possible to formulate several theories as to what might have occurred, but all of them fall within the realm of conjecture and surmise, which is insufficient to sustain the plaintiff's burden of proof. The theory most favorable to the plaintiff would be that the driver suddenly and quite irrationally turned the bus sharply to the right toward the sidewalk and away from its regular course of travel, but there is no suggestion that any part of the bus entered upon or crossed the sidewalk or otherwise left the limits of Woodfords Street, and such a theory would not accord with all the other evidence in the case. It is so palpably improbable and incredible that it cannot be accepted. "The admitted facts, together with the physical evidence, become, therefore, of great importance and should be analyzed with care to determine, if possible, where the truth lies." *Raymond* v. *Eldred, supra,* at page 14.

Counsel for plaintiff advances still another theory. He suggests that the driver must have turned to his left as he started the bus and sufficiently so that the rear righthand

corner of the bus swayed to the right sufficiently to strike the plaintiff. Such a theory is not only surmise but verges on the impossible. In the first place, a sudden and extreme left hand turn at that point would likewise have been irrational and unnecessary, and all the evidence conclusively shows that no such extreme left turn was made. Moreover, such a theory appears highly unlikely and improbable when viewed in relation to natural laws. When the front wheels of a vehicle are turned to the left, as the vehicle moves ahead, the rear wheels pursue a path somewhat to the left of that pursued by the front wheels, and in any event never to the right and outside the arc of travel of the front wheels. The extent of variation will depend on the degree of turn. This natural phenomenon has been recognized judicially. In *Masaracchia* v. *Inter-City Express Lines,* 162 So. (La.) 221 at 224, the court said, "When a vehicle makes a turn either to the right or to the left, unless the rear portion is wider than the front portion or unless the rear portion slips or skids across the roadway, the arc described by the rear wheels cannot be outside the arc previously described by the front wheels." See also *Pierre* v. *Templeman Bros.,* 164 So. (La.) 259. It is likewise equally true that if the body overhang in the rear of the rear wheels is approximately equal to the body overhang in front of the front wheels, the right rear corner of the body will not travel outside the arc described by the right front corner of the body. The plaintiff descended at the right front corner and practically upon the location of such an arc, and then moved some distance outside the arc. In the absence of any evidence, it was not proper to allow the jury to guess, speculate or conjecture that this bus was of such uncommon and unusual design as to have a rear overhang so much longer than the front overhang as to thrust the right rear corner outward on a left turn to an arc at least three feet outside the arc described by the right front corner. Thus natural laws control what would have had to be

the design of defendant's bus in order to lend any support whatever to plaintiff's theory. Uncontroverted and undisputed physical facts may completely override the uncorroborated oral testimony of an interested witness which is completely inconsistent with those physical facts, and natural and physical laws have universal application and may not be disregarded. "An appellate court must recognize that certain facts are controlled by immutable physical laws; and it cannot permit a jury verdict to change such facts, because to do so would, in effect, destroy the intelligence of the court." Huddy Encyc. Automobile Law 9th Ed., Vol. 17-18, page 94, sec. 65.

Still other and equally plausible theories present themselves upon this evidence. There was snow upon the ground and it is fair to assume that the pavement may have been slippery under foot. Either while the bus was passing or after it had passed, the plaintiff may have slipped and fallen. The fall may have been toward and into the side of the bus before it completely passed or it may have been to the pavement after the bus had passed. Or again, the plaintiff may have misjudged the timing with respect to the passing of the bus and may have stepped forward from her position of safety too soon. Or again, having in mind her apparent condition as to sobriety, the plaintiff may have become dizzy or have swayed or staggered or stepped into or toward the bus before it completely passed. It may or may not be significant that the sensation which she described that the bus swayed toward her would probably equally be her sensation if she in fact swayed toward the bus.

The important thing is that each one of these theories, however appealing, rests entirely upon conjecture and surmise, and the evidence is entirely without selective application as to any of them. Even though the condition of sobriety of the plaintiff may tend to make the last of these

theories seem more probable and likely than the others, even that hypothesis falls far short of the required proof, and we are left at the end without any proven explanation as to how this unfortunate accident occurred. It is not every misfortune that is compensable, and in this case the plaintiff, having failed completely to show any negligent conduct on the part of the defendant's driver which might be the proximate cause of her injuries, did not make out a case which required submission to the jury.

*Exceptions sustained.*