Jerry A. WILLIAMS

v.

Aubrey F. KINNEY.

Supreme Judicial Court of Maine.

May 31, 1966.

Bernstein, Shur, Sawyer & Nelson, by Herbert H. Sawyer, Monaghan & Perkins, by Stephen L. Perkins, Portland, for plaintiff.

Verrill, Dana, Walker, Philbrick & Whitehouse, by John W. Philbrick, Portland, for defendant.

Before WEBBER, TAPLEY, MARDEN, RUDMAN and DUFRESNE, JJ.

MARDEN, Justice.

On appeal from judgment to defendant *non obstante veredicto*.

The case arises out of collision between motor vehicles proceeding northerly on a four lane highway in Scarborough, the defendant's vehicle overtaking and colliding with the plaintiff's vehicle as it was making a left turn to enter premises westerly of the highway.

The highway, Route 1, may be considered as running north and south. It is a highway approximately 40 feet in width, with the center marked by double yellow lines, with what has been referred to as two lanes on the easterly side of the yellow lines for

north bound traffic and two lanes on the westerly side of the yellow lines for south bound traffic. For purposes of discussion we identify the four lanes in the highway as numbered one to four from west to east. Applying this identity to the lanes, lanes one and two would be considered as lanes for south bound traffic, and lanes three and four would be considered lanes for north bound traffic. Further identifying these lanes, lane two would be termed the passing lane for south bound traffic and lane three the passing lane for north bound traffic. There is no median strip or barrier.

Facts not in dispute establish that plaintiff was proceeding north toward Portland, after dark, in lane four intending to enter a place of business on the west side of the highway, which called ultimately for his making a left turn into the entrance. In moving from lane four into lane three he was aware, by use of his rear view mirror and observation of lights, of a vehicle to his rear which he placed at a distance of approximately 500 feet. In making the move from lane four to lane three he displayed his directional signal light and thereafter proceeded northerly in lane three. As he was so proceeding he was aware by the same means of observation that the car to his rear had drawn closer, which he estimated then at 300 to 400 feet behind him. He continued northerly with his left turn signal light operating and, no south bound traffic to the contrary, he made his left turn into the path of the defendant who was then attempting to pass the plaintiff in lane two, on plaintiff's left. A collision resulted involving property damage and personal injury.

Upon trial, plaintiff was awarded verdict over which, upon motion, judgment was granted for defendant, and plaintiff appeals. The case comes to us with a record of the testimony of the plaintiff and two corroborating witnesses, counsel correctly testing the validity of the judgment n. o. v. upon the evidence supporting the plaintiff viewed in the light most favorable to him.

Kennedy v. Flagg, 145 Me. 399, 75 A.2d 850, Ward v. Merrill, 154 Me. 45, 48, 141 A.2d 438, the same test as applied to a directed verdict, Maine Civil Practice § 50.4. In the terms of the case, the question is whether plaintiff was contributorily negligent as a matter of law.

The granting of the judgment n. o. v. was founded upon defendant's contention that plaintiff "saw the defendant's vehicle close to him and in the lane of the highway to his left prior to the time he started his left turn and, nevertheless, made his left turn into the path of the defendant's overtaking vehicle"; which conduct when measured by our rule governing "left turns" made plaintiff contributorily negligent as a matter of law.

Plaintiff's testimony under cross-examination yielded evidence upon which defendant's motion was based.

"Q Was there any traffic—at the point at which you decided to turn into Martin's driveway (his destination), was there any traffic coming south bound?

"A One up by the Portland Drive-in Theater.

"Q So that you did not have to wait?

"A No, sir.

"Q To make your turn?

"A No, sir.

"Q And you say you had seen the truck or vehicle approaching you in back of you at some distance away back here, so that when you prepared to make your turn into Martin's you weren't worried about that either, were you. You weren't worried about how close this truck was to you when you made this turn?

"A No, he had plenty of room to go by me on the inside.

"Q When was the last time you saw this truck before the collision?

"A I looked back just before I got ready to turn.

"Q  What did you see?

"A  I saw—I just heard a racing engine. That is all.

"Q  Pardon?

"A  I just heard a racing. I was over in the left-hand lane. I figured I was safe. That is where I was supposed to be to make a left-hand turn.

"Q  What did you see when you looked back? You just said you looked back over your shoulder just before you turned. What did you see?

"A  I saw headlights coming at me.

"Q  How close were they this time?

"A  I don't know how close they were.

"Q  Were they still 500 feet away?

"A  No.

"Q  Could you see, could you tell on your look backward where this truck was located? Was he in the lane you have marked number 3, the inside, north bound lane, or the outside north bound lane?

"A  *He was in the passing lane of the south bound lane.* (Emphasis added.)

"Q.  Let me understand you. He was in this lane you have marked number 2, this passing lane of the south bound lane when you saw him, is this correct, before, just before you turned?

"A  I saw the headlights. I turned over, I saw the truck way back up there about 500 feet. Then I looked back once before; just before I turned I didn't look back. I didn't expect the trailer truck to come hit me.

"Q  Just before you turned; you looked back again?

"A  No, not just before I turned. I didn't figure this trailer truck was going to hit me.

"Q  Just a minute ago, I understood you to say just before you turned you looked back and saw this truck coming in the passing lane of the south bound lane, is that correct.

"A  I don't understand what you mean. Please repeat it.

(Pending question read by the Reporter.)

"A  (Q) How far away do you say he was when you saw him at that time?

"A  He was pretty close to me then.

*    *    *    *    *    *

"Q  Just before you turned, you saw him very close to you in this passing lane of the south bound roadway, right?

"A  Yes, sir.

"Q  And then you turned?

"A  Yes, sir.

"Q  Right into his path?

"A  I didn't know where he was. I didn't know he was going to come on the left-hand side of me. He had plenty of room to go on the right-hand side of me.

"Q  Did you not just say, Mr. Williams that before you turned, you looked back and you saw him in this south bound lane, wasn't that your testimony just a minute ago?

"A  Yes, sir.

"Q  And then you made your turn right in front of him, but you say you thought that he was going to pull back and pass you on the right, is this your testimony?

"A  Yes, sir."

The problems posed by collisions between vehicles making a "left turn" and others, approaching either from the opposite direction or overtaking, are adequately recorded in the Maine reports.[1]

---

1.  Class A (2 lane way) cases: Ritchie v. Perry, 129 Me. 440, 152 A. 621; Gustin v. Asskov, 129 Me. 494, 151 A. 443; Esponette v. Wiseman, 130 Me.

While footnote 1 lists all which have been called to our attention, and which we have found, we do not represent the list is complete.

Our cases involving such collisions have, to this time, dealt only with two lane and three lane highways.

Cases involving a two lane highway (Class A cases), bearing traffic in both directions, represent one setting. In such cases, any left turn may involve crossing the path over which a vehicle approaching from the opposite direction has the right of way, Fernald v. French, 121 Me. 4, 6, 115 A. 420, or an overtaking vehicle has a qualified right of way, O'Malia v. Thomas, 123 Me. 286, 287, 122 A. 773.

In *Fernald*, supra, (1921) the first situation was passed upon and the frequently cited "reasonable insurance of safe passage" rule for the turning vehicle was established.

In *McCarthy*, supra, 132 Me. p. 359, 171 A. p. 261 (1934) the second situation was passed upon and the court said: "No less strict rule can be applied to operators attempting to cross the *right of way* (emphasis added) of cars coming from behind."
This rule originated in Verrill v. Harrington, 131 Me. 390, 395 (1931), 163 A. 266, dealing with a three lane highway.

In cases involving three lane highways (Class B cases) bearing traffic in both directions, the middle lane was recognized as a "passing" lane over which traffic in either direction had a right of way. *Verrill*, supra,

131 Me. p. 395, 163 A. 266. This became a subject of statute by Chapter 168 P.L. 1947, and is now 29 M.R.S.A. § 991.

This rule was super-imposed upon the Class A cases by *McCarthy*, supra.

*Verrill*, supra, established the rule that a driver intending a left turn to cross the *right of way* of an overtaking vehicle must so watch and time the movements of the other car "as to reasonably insure himself of a safe passage."

*O'Malia*, supra, (1923) determined that on a two lane highway the overtaking car has a qualified right of way over the second lane,—with statutory qualification since Chapter 327 P.L.1929, sections 19 and 21(a).

*Verrill*, supra, determined that on a three lane highway the overtaking car has a right of way over the middle lane,—with statutory qualification since Chapter 168 P.L. 1947.

These decisions as to a two lane road *Fernald* and *O'Malia* cases, supra, as to a three lane road, *Verrill*, supra, and the statutes [2] as to both roads, are realistically and rationally founded and grant a right of way to the overtaking car, conditioned upon its compliance with statutory terms and the ever present rule of due care.

The present case solicits the applicability of these subsisting rules to a four lane highway, without median strip or barrier, but centered with double yellow lines, and utilized by traffic as recited at the beginning of this opinion. Absent a statute

297, 155 A. 650; Crawford v. Lancaster, 130 Me. 525, 157 A. 859; Field v. Webber, 132 Me. 236, 169 A. 732; McCarthy v. Mason, 132 Me. 347, 171 A. 256; Rawson v. Stiman, 133 Me. 250, 176 A. 870; Bedell v. Androscoggin & Kennebec Railway Company, 133 Me. 268, 177 A. 237; Erwell v. Harmon, 139 Me. 47, 27 A.2d 107; Davis v. Baker, 139 Me. 229, 28 A.2d 740; Beane v. Hartford, 140 Me. 62, 33 A.2d 927; Kennedy v. Flagg, 145 Me. 399, 75 A.2d 850; Bennett v. Lufkin, 147 Me. 216, 85 A.2d 922; Gamache v. Cosco, 147 Me. 333, 87 A.2d 509; Feely

v. Norton, 149 Me. 119, 99 A.2d 285; White v. Schofield, 153 Me. 79, 134 A. 2d 755; Beal v. Wood, 156 Me. 414, 165 A.2d 61; and Bickford v. Berry, 160 Me. 9, 196 A.2d 752.
Class B (3 lane way) cases: Verrill v. Harrington, 131 Me. 390, 163 A. 266; Reid v. Walton, 132 Me. 212, 168 A. 876; and Pillsbury v. Kesslen Shoe Company, 134 Me. 504, 188 A. 726.

2. Now 29 M.R.S.A. § 943 allowing overtaking vehicles free passage to the left. 29 M.R.S.A. § 991 designating middle lane of three lane highway as "passing" lane.

limiting upon the present facts, the use of such a way, and consistent with its use in common with others, a motorist "may drive on any part of it," *O'Malia,* supra, 123 Me. at p. 287, 122 A. at p. 773, and the rules of due care as established for the more conventional two and three lane ways and announced in the cases cited in the footnote, subject, however, to statutes since enacted, govern.

■ Our earlier cases of *Fernald, McCarthy* and *Verrill,* all supra, place significance upon any "right of way" involved and the duty of the operator proposing to cross such a right of way. Assuming, without finding, that Chapter 71 P.L.1957, as amended, by Section 32, Chapter 429 P.L. 1957 and now 29 M.R.S.A. § 1152 [3] awards the leading car precedence,—a right of way, due care does not permit the possessor of the right of way to exercise it without regard to the circumstances. Fitts v. Marquis, 127 Me. 75, 77, 140 A. 909, and McCarthy, supra, at 353. A constant *duty* of due care overrides a *right* of way.

■ Admittedly the nature of the locality,—business or residential, the statutory need for audible warning of proposed passage and whether or not, if necessary, such warning was given is a jury question, but the case is not here to test the defendant's jury-found negligence. Assuming defendant ignored a statutory duty to give audible warning, assuming defendant had statutory permission to overtake and pass plaintiff on plaintiff's right, assuming plaintiff had complied with all rules of the road prelimi-

nary to his left turn, plaintiff was, before turning, aware of defendant's approach from the rear; plaintiff was, before turning, aware of defendant's approach in lane two and, without further observation, executed his left turn with resultant collision.

Assuming plaintiff had precedence and concomitant right to turn and assuming defendant had established no right to pass, plaintiff was at pertinent times conscious of defendant's increasing proximity and of defendant's presence in lane two, and it became his duty, not by virtue of crossing any right of way which defendant had gained, but by virtue of the duty superimposed upon the exercise of his own right of way, by rules both of due care and the road [4] to determine that his movement could be made with reasonable safety. The rules of *Fernald, McCarthy* and *Verrill,* supra, must be extended, within the facts of this case, to both a four lane way and to situations where the rule of due care negatives the exercise of a technical right of way. Plaintiff was burdened with so watching and timing the movements of the other car as to reasonably insure himself of a safe passage. *Fernald,* supra, 121 Me. at p. 9, 115 A. 420, *McCarthy,* supra, 132 Me. at p. 359, 256. This he did not do and his failure charges him with contributory negligence as a matter of law.

It becomes unnecessary to discuss defendant's contention that the appeal should be denied by reason of plaintiff's failure to bring up a reproduction of the "chalk" made and used during trial. In this case the ab-

3. "§ 1152. * * *
"Except when overtaking and passing on the right is permitted, the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle.
"No vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a suf-

ficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. * * *."

4. "§ 1191. * * * No person shall * * * turn a vehicle to enter a private road or driveway or otherwise turn a vehicle from a direct course, or move right or left upon a roadway unless and until such movement can be made with reasonable safety. * * *."

sence of such "chalk" does not prejudice our understanding of the evidence.

Appeal denied.

WILLIAMSON, C. J., did not sit.

DUFRESNE, Justice (dissenting).

I agree with the majority opinion wherein it most elucidatively expounds our decisional and statutory rules applicable to motor vehicle left turns on 2-lane and 3-lane highways. However, I must dissent, when the majority of this Court holds that our present statutory scheme and policies regulating the operation of motor vehicles on our modern multiple lane highways did not provide regulatory limitations respecting the operation on the highway of the defendant's high-powered jet-like truck which was being driven as if it had a special license to be anywhere and everywhere on the road. Unlike cases of vehicles on emergency runs, the plaintiff did not have the benefit of blinking red lights or blaring sirens to warn him to seek cover.

The right to drive on any part of the highway as espoused by the majority will produce in the future, as it did in this case, the most inane accidents with utmost frustration to our enforcement authorities and those genuinely interested in accident control. Should drivers take this Court at its word, and as a matter of choice operate their high powered vehicles on what all drivers have been led to identify as the wrong side of the road, even when no oncoming traffic is approaching, then let the motoring public beware of the cowboy on wheels. According to the majority, a motorist on a 4-lane highway may operate in the outside lane intended for traffic going in the opposite direction with legal sanction, until he approaches a curve in the road, reaches a rise in the way or oncoming traffic appears; he must then seek a quick retreat to his own right side of the highway. One can readily imagine the dangers which the exercise of such a right would

cast upon our roads. We do recognize the right of a motorist to use the left side of the road to overtake and pass another vehicle when such overtaking and passing on the left is legally permissible. There may be other situations where driving to the left of the center of a highway may meet with legal approval. But to hold that a motorist has such a right as a matter of basic principle in driving philosophy is to revert to the antiquitous horse and buggy day era.

It is error to say that our statute under the circumstances of the instant case did not prohibit the defendant from passing to the left of the plaintiff; indeed, if the defendant intended to pass at the time the plaintiff was making a proper left turn, then the law compelled him to do so to the right of the plaintiff, i. e. in the outside north bound lane of traffic.

True, our statutes do not expressly provide for right side driving, nor do they ban left side driving, generally; however, everybody will concede that in Maine as in all the country, the basic and initial rule of the road is that the driving must be on the right side of the road and not on the left side thereof. Even though the Legislature has not expressly formalized such a general rule of the road, it has recognized the same in the enactment of regulations affecting the driving of vehicles in practically all situations imaginable. Chapter 29 of M.R.S.A. bears this out: The following sections control vehicle operations in the particulars stated: Single lane driving, § 991(1); center lane driving on 3-lane highway, § 991 (2); driving on highways divided by intervening space or physical barrier, § 992; driving on one-way roadways, § 993; turning at intersections, § 994; distance to follow, §§ 1031, 1032; parking, § 1111; passing or overtaking, §§ 1151, 1152, and many others. This legislation enacted for the purpose of promoting safety in travel as well as to facilitate the flow of traffic, must be interpreted as a harmonious whole to reach the goals intended. We must see in our legislators men of reasonable vision,

cognizant of an expanding economic growth with an increasing motoring traffic year by year as population grows and better automotive vehicles become available. Our legislation on motor vehicle control must be interpreted, if at all possible, with a modern mind, as an enlightened chart for effective control of modern traffic under modern road conditions while at the same time promoting steady movement of vehicles with reasonable safety. These traffic statutes are to be compared and brought into full complementing accord if possible, but if complete agreement is unsusceptible, then such construction should be adopted as will permit their parallel operation as far as possible. See Steele v. Smalley, 141 Me. 355, 44 A.2d 213.

29 M.R.S.A. §§ 1151 and 1152 must be interpreted as a single section; they regulate the conduct of the overtaking and overtaken motorists. The first paragraph of each is repetitious of the other:

"The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at a safe distance to the left thereof and shall not again drive to the right side of the highway until safely clear of such overtaken vehicle."

Then § 1152, after having ordained motor vehicle overtaking by passing to the left, sets out to legislate the duties of the driver of the overtaken vehicle in this way:

"The driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle".

But these duties devolving upon the overtaken motorist do not apply under all circumstances, as the above mentioned clause is qualified by an introductory exception and thus reads in full as follows: *"Except when overtaking and passing on the right is permitted,* the driver of an overtaken vehicle shall give way to the right in favor of the overtaking vehicle on audible signal and shall not increase the speed of his vehicle until completely passed by the overtaking vehicle." [Emphasis supplied.]

Thus, by reference to the exception, § 1151 is incorporated into § 1152, immediately after the initial command to overtake by passing to the left. The overtaking by passing to the right section reads in pertinent part:

"The driver of a vehicle *may* overtake and pass upon the right of another vehicle only under the following conditions:

1. *Left turn.* When the vehicle overtaken is making or about to make a left turn;

\* \* \* \* \* \*

4. On the right. The driver of a vehicle *may* overtake and pass another vehicle upon the right only under conditions permitting such movement in safety. In no event shall such movement be made by driving off the pavement or main-traveled portion of the roadway." [Emphasis supplied.]

Then § 1152 continues and provides for the safe overtaking when passing to the left in similar way that § 1151(4) provided for the safe overtaking when passing to the right, to wit:

"No vehicle shall be driven to the left side of the center of the roadway [as provided in the first paragraph of this section] in overtaking and passing another vehicle proceeding in the same direction unless such left side is clearly visible and is free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completely made without interfering with the safe operation of any vehicle approaching from the opposite direction or any vehicle overtaken. In every event the overtaking vehicle must return to the right-hand side of the roadway before coming within 100 feet of any vehicle approaching from the opposite direction."

The use of the term "may" in relation to overtaking by passing to the right, instead of the word "shall" which is asso-

ciated with overtaking by passing to the left, was made necessary, because of the format of expression. Where the act to be done concerns the public interest as in the instant case, to wit, the mutual duties and obligations of motorists in the act of overtaking and passing, and where the overtaken motorist has a right to have the overtaking take place to the right of him in protection of his lawful left turn as provided by law, then the execution of the power to overtake, if the power is exercised, must be insisted upon as a duty, even though the statutory language is couched in terms of permissiveness. Inhabitants of Milford v. Inhabitants of Orono, 50 Me. 529; Low v. Dunham, 61 Me. 566. The statute is mandatory and the defendant's overtaking of the plaintiff by passing to the left was not only civil negligence, a euphemism when applied to the circumstances of this case, but also a criminal violation under 29 M.R.S.A. § 2303.

Also, 29 M.R.S.A. § 1191, provides that "no person shall turn a vehicle at an intersection *unless the vehicle is in proper position upon the roadway* as required in section 994, *or turn a vehicle to enter a private road or driveway* or otherwise turn a vehicle from a direct course, or move right or left upon a roadway unless and until such movement can be made with reasonable safety" * * * The reference section 994, applicable to left turns at intersections indicates that the proper positional approach for such a turn must be *in that portion of the right half of the roadway nearest the center line thereof.* Even though the instant left turn was not at an intersection, the plaintiff's approach to a legally authorized left turn into a private driveway in similar manner as demanded at an intersection of ways would evince exercise of due care and be commendable in law.

Furthermore, 29 M.R.S.A. § 991, relating to center lane driving, provides as follows:

"Upon a roadway which is divided into 3 lanes a vehicle shall not be driven in the center lane except when overtaking and passing another vehicle where the roadway is clearly visible and such center lane is clear of traffic within a safe distance, or in preparation for a left turn * * *".

The majority concedes as they must under the evidence, that the plaintiff, prior to his entering the passing lane for south bound traffic, had complied with the law of the road, statutory or otherwise, in preparing himself for a left turn, and that his presence in the passing lane for north bound traffic was lawful. In the majority's viewpoint then, did not the plaintiff, already in the passing lane lawfully, have the right to use the full extent of the passing lanes without interference from the defendant who either entered or had been driving in the passing lane contrary to law? Is a 4-lane highway, according to the majority, a 3-lane highway with a double-width passing lane? Upon any analysis of the situation, we are compelled to conclude that the plaintiff had the right of way and was exercising the same when he was recklessly catapulted off the highway in complete disregard of the law of the road or the laws of common sense and decency. The laws of the road applicable to 3-lane highways were equally applicable to the instant 4-lane highway, at least in the particulars involved herein. See Lee Bros. v. Jones, 114 Ind. App. 688, 54 N.E.2d 108 (1944).

The majority further concedes that the plaintiff was further aided in his left turn endeavor by the presence of double yellow lines marking the center of this four lane highway, and it is uncontradicted in the evidence that these lines were visible at the time. These highway symbols, appearing on our roads and traffic signs and taught in driver education, in this case two solid yellow lines, have acquired with the general motoring public, the definite command of "do not pass" or "stay on your own right side". We take judicial notice that drivers generally understand that passing against the yellow line means dangerous and perilous operation, an ominous potential for injury to person or property. Enforcement authorities look upon them as the law. We appreciate, of course, that such symbols,

even though they may indicate what our highway engineers through expert studies have in their sound judgment considered as necessary for the safe operation of motor vehicles at particular locations, have not the force of law as such, but their presence on the road is nonetheless an effective warning to all motorists of the particular dangers to be apprehended. This was a circumstance for the consideration of the jury and of this court in any analysis of the plaintiff's conduct.

The question on appeal herein is whether the Justice below committed error in giving judgment to the defendant notwithstanding the jury verdict in favor of the plaintiff, and in testing the validity of such action, like in cases where a directed verdict is originally granted, the evidence must be considered in the light most favorable to the party against whom the directed verdict or the judgment n.o.v. was asked, i.e. in favor of the plaintiff. Bragdon v. Shapiro, 146 Me. 83, 84, 77 A.2d 598; Kennedy v. Flagg, 145 Me. 399, 75 A.2d 850; Ward v. Merrill, 154 Me. 45, 48, 141 A.2d 438.

And to view the evidence in the light most favorable to the plaintiff means that the presiding Justice, as well as this Court on the appellate level, should resolve any conflict in the evidence in his favor and draw for his benefit any legitimate conclusion or inference therefrom. Burcham v. J. P. Stevens & Co., Inc., et al., U.S.C.A. 4th, 209 F.2d 35.

It is well established in this state that a verdict should not be ordered for the defendant by the trial court when, taking the most favorable view of the plaintiff's evidence, including every justifiable inference, different conclusions may be fairly drawn from the evidence by different minds. Robichaud v. St. Cyr, 150 Me. 168, 170, 107 A.2d 540; Howe v. Houde, 137 Me. 119, 15 A.2d 740; Collins v. Wellman, 129 Me. 263, 151 A. 422.

It is only where the evidence is such that reasonable men can reach but one conclusion therefrom that question of negligence or contributory negligence become questions of law for the court, and it is for the jury and not the appellate court to determine the credibility of witnesses. Knoepfle v. Suko, 108 N.W.2d 456 (N.D.1961).

Where reasonable men may differ as to the conclusions of facts to be drawn from the evidence, or if the conclusion is dependent upon the weight to be given the testimony, a factual question is presented for determination by a jury. Mills v. Wells, 204 Va. 173, 129 S.E.2d 705, 708.

Contributory negligence is ordinarily a question for jury determination. Mills v. Wells, supra. Tomlinson v. Clement, Bros., 130 Me. 189, 193, 154 A. 355. The question of causal connection is usually for the jury. Wiles et al. v. Connor Coal & Wood Co., 143 Me. 250, 259, 60 A.2d 786; Feely v. Norton, 149 Me. 119, 126, 99 A.2d 285; Barlow, pro ami v. Lowery, 143 Me. 214, 219, 59 A.2d 702; Kirouac v. Androscoggin & K Railway Co., 130 Me. 147, 154 A. 81; Neal v. Rendall, 98 Me. 69, 74, 56 A. 209, 63 L.R.A. 668.

In the application of the foregoing rule, the court should not proceed to weigh the evidence or to decide what inferences to be drawn therefrom are the more reasonable. In the instant case, the majority, instead of adopting the aspect of the evidence most favorable to the plaintiff, weighs certain inconsistent testimonial assertions of the plaintiff [and the inconsistency is highly debatable] against his other positive testimony and against the positive testimony of a corroborating witness whose credibility is rejected without any possible, let alone any reasonable, basis therefor. Such an unjustified usurpation of the parties' right to a jury trial should not go unnoticed.

We are aware of the rule where testimonial evidence favoring the plaintiff may be rejected by this court, as well as by the trial court, in testing the propriety of a directed verdict for the defendant. Our Court has stated it as follows:

"In determining the issue the Law Court must proceed upon the theory that the jury

had a right to accept the testimony of the plaintiff's side as true, and to reject all the testimony of the defendant's side as untrue, mistaken, or unsatisfactory, *unless the testimony, including the circumstances and probabilities, reveals a situation that proves the testimony on the plaintiff's side to be inherently wrong.*" [Emphasis supplied.] Palmitessa v. Shaw, 157 Me. 503, 506, 174 A.2d 570, 571. In Palmitessa, the uncorroborated testimony of the plaintiff to the effect that prior to entering upon the defendant's lane of traffic to cross to the other side of the road with 500 to 600 feet of vision, he had looked to his left and saw nothing, was rejected as "inherently wrong" where the physical debris upon the road placed the point of impact at the middle yellow line. The Court added that it was *impossible to accept as objective reality and fact* plaintiff's asserted details of the happening of the accident. We must notice in the reference case that the defendant had the right of way. Verdict for defendant was directed.

The rule would have application if the evidence tending to support the plaintiff was not such as reasonable minds would be warranted in believing, as when such favorable evidence is incredible or unreasonable, or inconsistent with the proved circumstances of the case, or when the evidence contrary to the plaintiff's position is so overweighing and so overwhelming as to make it appear that the jury could not reasonably and rationally find a verdict in favor of the plaintiff. Jordan v. Portland Coach Company, 150 Me. 149, 150, 107 A.2d 416. In Jordan, the court could not find a scintilla of evidence as to any negligence on the part of the defendant. See also, Raymond v. Eldred, 127 Me. 11, 140 A. 608, where the plaintiff's evidence was contrary to facts conclusively established and where plaintiff's version could not possibly be correct. Spang v. Cote et al., 144 Me. 338, 68 A.2d 823; Daughraty v. Tebbets, 122 Me. 397, 398, 120 A. 354, 34 A.L.R. 1507; Garmong v. Henderson, 114 Me. 75, 95 A. 409.

The plaintiff's evidence in the instant case, supported by the testimony of a disinterested witness, was neither inherently wrong, nor incredible or unreasonable; it was consistent with all the proven factual circumstances; the apparent inconsistency in plaintiff's statements was reconcilable in the eyes of the jury, and was so reconciled with support in the evidence in favor of the verdict for the plaintiff.

The plaintiff was not bound to anticipate defendant's negligence or recklessness; one may assume at all events, *until the contrary appears,* that approaching automobiles will be driven carefully, and especially so, when these automobiles are coming from the rear. Plaintiff, having proceeded with care from the time he entered the highway to the time he had lawfully positioned himself close to the middle line of the highway preparatory to crossing the south bound lane of traffic, and having the right of way over any vehicle coming from the rear, had the right to expect, as any ordinarily prudent person would, that the defendant would pass to the plaintiff's right in respect of the law's requirement and the plaintiff's continuous signal of intentions to cross over the south bound lane. Crockett v. Staples, 148 Me. 55, 59, 89 A.2d 737; Ross v. Russell, 142 Me. 101, 105, 48 A.2d 403; Davis v. Simpson, 138 Me. 137, 145, 23 A.2d 320; Gold v. Portland Lumber Corp., 137 Me. 143, 16 A.2d 111; Field v. Webber, 132 Me. 236, 244, 169 A. 732; Smith v. Elliott, 122 Me. 126, 129, 119 A. 203.

The majority states that, even if the plaintiff had the right of way, due care does not permit the possessor of the right of way to exercise it without regard to the circumstances, and that "a constant duty of due care overrides a right of way". We do not dispute that rule, but we say that its application in this case was for the jury as a matter of fact and not for the court as a matter of law. If the plaintiff had knowledge, actual or constructive, that the defendant would not respect his right of way but would violate the law, and thus a collision would probably ensue if he insisted on

his right of way, then the plaintiff would have been legally bound to yield his right of way and take preventive action.

We presume that the jury was so instructed as there were no objections to the justice's charge. Sanborn v. Stone, 149 Me. 429, 433, 103 A.2d 101; Barlow, pro ami v. Lowery, 143 Me. 214, 219, 59 A.2d 702; Eaton v. Marcelle, 139 Me. 256, 257, 29 A.2d 162; Frye v. Kenney, 136 Me. 112, 115, 3 A.2d 433.

The jury therefore must be presumed to have found that the plaintiff did not know that the defendant was operating, or was about to pass him, in the south bound lane in time to take saving action to prevent the accident.

The majority decides as a matter of law that he did, and relies for its rejection of the verdict of twelve unbiased persons who saw the plaintiff and his witnesses, on an apparent contradiction by the plaintiff himself in cross-examination.

The plaintiff, in direct testimony, had stated that he spotted the defendant's truck in the rear when he was some 550 feet ahead of it, and that "I was turning into Martin's, had the front wheel over the yellow line, and I heard this racing engine coming towards me * * * right beside me * * * left hand side, out in the south bound lane, and I heard a big crash. * * * "

Then, the following colloquy took place:

"Q  Were you watching the rear view mirror at all times so that you would have noticed if the lights had blinked up and down?

A  No, I was watching where I was going. I had my directional light on. *I was already on the left-hand lane.*

Q  You were already in the left-hand lane when?

A  When this—I got *in the left-hand lane* when I see that truck about 500 feet in back of me.

Q  When you first saw the truck—I don't mean to confuse you; let's get it straight. When you first saw the truck, you were in the right-hand lane?

A  Yes.

Q  You looked, saw the truck about 500 feet back, and you figured you had enough time to pull into the left lane, so you did?

A  Yes.

Q  You were in the right-hand lane when you first saw the truck?

A  Yes, sir.

Q  Now, from the time you first saw the truck, I believe you stated just a minute ago, from the time you first saw the truck until the time you got out into the left-hand lane, anticipating to make your turn, you kept an eye on the headlights in your rear view mirror? [This was contrary to what the plaintiff had previously said.]

A  When I saw the truck—I looked back and saw the truck so far back I got in the left-hand lane. *The truck was about 500 feet in back of me at that time.* * * *

Q  So you pulled into the left-hand lane. Did you notice if the truck was coming any closer to you?

A  No. When I saw it at that distance, I got over there then.

Q  You got over there and you didn't look back at the truck any more after you saw it back here some distance away, is that correct?

A  That's correct."

*  *  *  *  *  *

"Q  And you say you had seen the truck or vehicle approaching you in back of you at some distance away back here, so that when you prepared to

make your turn into Martin's you weren't worried about that either, were you? You weren't worried about how close this truck was to you when you made this turn?

A No, he had plenty of room to go by me on the inside.

Q When was the last time you saw this truck before the collision?

A *I looked back just before I got ready to turn.*

Q What did you see?

A I saw—*I just heard a racing engine.* That is all.

Q Pardon?

A I just heard a racing. I was over in the left-hand lane. I figured I was safe. That is where I was supposed to be to make a left-hand turn.

Q What did you see when you looked back? You just said you looked back over your shoulder just before you turned. What did you see?

A *I saw headlights coming at me.*

Q How close were they this time?

A I don't know how close they were.

Q Were they still 500 feet away?

A No.

Q Could you see, could you tell on your look backward where this truck was located? Was he in the lane you have marked number 3, the inside, north bound lane, or the outside north bound lane?

A He was in the passing lane of the south bound lane.

Q Let me understand you. He was in this lane you have marked number 2, this passing lane of the south bound lane when you saw him, is this correct, before, just before you turned?

A *I saw the headlights. I turned over, I saw the truck way back up there about 500 feet. Then I looked back once before; just before I turned I didn't look back. I didn't expect the trailer truck to come hit me.*

Q Just before you turned; you looked back again?

A *No, not just before I turned. I didn't figure this trailer truck was going to hit me.*

Q Just a minute ago, I understood you to say just before you turned you looked back and saw this truck coming in the passing lane of the south bound lane, is that correct.

A I don't understand what you mean. Please repeat it. (Pending question read by the Reporter.)

A *How far away do you say he was when you saw him at that time?*

A *He was pretty close to me then.*

Q This was before you had turned, right?

A Yes, sir. *I was in the process of turning then.*

Q As I recall your testimony a minute ago, you said before you turned you looked back again.

A *I was steering the car while I looked back; I was making my turn. When I looked back there was nothing I could do then.*

Q How many times did you see the truck in your rear view mirror from

the time you pulled out of Mary and Bob's until the time of collision? How many times did you see this truck, or headlights, in your rear view mirror, twice, three times?

A    About three times.

Q    Once was when you were 500 feet apart, back here, right?

A    Yes.

Q    When was the next time?

A    When I was just up a little bit further; when I was in the left-hand lane.

Q    How far do you say the truck was away from you at that point?

A    *About 300 feet, 400 feet.*

Q    What lane was the truck in when *you saw it at that time?*

A    *It was in the passing lane.*

Q    *The same lane you were in?*

A    *Yes, sir.*

Q    Now, you say you looked again?

A    Yes, sir.

Q    When was this?

A    *Just before I turned there.*

Q    Just before you turned?

A    Yes, sir.

Q    And where was he at that time?

A    *He was coming pretty close to me.*

Q    What lane was he in at that time?

A    The third lane. *I was just over the yellow line.*

Q    Just before you turned, you saw him very close to you in this passing lane of the south bound roadway, right?

A    Yes, sir.

Q    And then you turned?

A    Yes, sir.

Q    Right into his path?

A    *I didn't know where he was. I didn't know he was going to come on the left-hand side of me. He had plenty of room to go on the right-hand side of me.*

Q    *Did you not just say, Mr. Williams that before you turned, you looked back and you saw him in this south bound lane, wasn't that your testimony just a minute ago?*

A    *Yes, sir.*

Q    *And then you made your turn right in front of him, but you say you thought that he was going to pull back and pass you on the right, is this your testimony?*

A    *Yes, sir.*"

The majority bumps the plaintiff out of court because of his stated agreement to counsel's interpretation of plaintiff's previous testimony that "before you turned, you looked back and you saw him in this south bound lane" * * * that "you made your turn right in front of him, but you say you thought that he was going to pull back and pass you on the right."

These statements, if interpreted in the light most favorable to the plaintiff, only mean that immediately before he turned and while turning, he was looking back and saw as he had said before lights coming at him and heard a racing engine, that he was steering his car while looking back, that the car was turning, that the defendant, at that time factually was in the passing lane of the south bound traffic, where he, the plaintiff, had no reason to expect him, but that when he looked back there was nothing he could do then. He did agree that as the events turned out, it was a fact that the defendant was in the south bound passing lane and that he, the plaintiff, had turned in right in front of him.

One of plaintiff's witnesses, waiting in automobile at the westerly edge of Route 1 on the driveway leading from Martin's immediately to the south of the driveway which the plaintiff intended to enter, and in a position to oversee the approach of both the plaintiff car and the defendant truck, placed both vehicles in the same north bound passing lane 150 feet away from the point of impact, and without contradiction further testified under oath that "he [the defendant] pulled over across the yellow line to try to pass and Jerry [the plaintiff] had just started to make the turn." He identified the point of impact as the center part of plaintiff's car.

This testimony, unjustifiably and unreasonably discredited by the majority, completely supported and explained the plaintiff's version of the accident and taken together with plaintiff's statements, dispels any claimed contradiction, which an analysis favorable to the defendant might raise.

Even if his observation at the time of his turn was improperly made, or even if it was not made at all, where the plaintiff had the right of way over the defendant's truck, may we not properly ask, as did Chief Justice Williamson, in Tinker v. Trevett, 155 Me. 426, 429, 156 A.2d 233, what the plaintiff should have observed with reference to the defendant's truck as it advanced upon him. Where was the defendant's truck when the plaintiff should have observed that the truck was about to overtake him on the left in the south bound lane? How much, if at all, had the plaintiff committed himself into the south bound lane at the time? What, if any, saving action could have been taken by him? At what point, should the plaintiff have realized that the defendant in his reckless operation of his truck had peremptorily vetoed plaintiff's warning signal to cross over.

"Whether the plaintiff was in the exercise of due care, was a pure question of fact, under all the circumstances of the case, for the jury. The jury was as able to determine that question as the law court, even if the law court had jury powers. It was the opinion of the jury that he was not negligent. It might be our opinion that he was. But that does not confer upon us a right to negative their judgment. If there was evidence upon which reasonable men might disagree the verdict should not be disturbed. The jury were the only tribunal that could try the case. They heard the evidence, and the parties were before them. Just what reasonable care required, under the circumstances in which the plaintiff found himself when he started to cross the road, when confronted by the oncoming car at an unreasonable rate of speed, as the jury had a right to find, is a question that probably cannot be decided by any definite standard of action. As a matter of common knowledge and experience, the situation before the plaintiff was sudden and confusing, and created an emergency in which the concept of hesitation and action arose together, like a flash." Daughraty v. Tebbets, 122 Me. 397, 400, 120 A. 354, 355, 34 A.L.R. 1507.

"Did plaintiff, in the jaws of danger, where instant action by him was requisite, act as an ordinarily careful and prudent man would reasonably act? This question was one to be decided, not by a careful calculation afterwards, nor by the conduct of a man under no excitement, with time to deliberate, but by what a man of average circumspection would have done under like surroundings and in the like situation." Tomlinson v. Clement Bros., 130 Me. 189, 194, 154 A. 355, 358.

From a reading of plaintiff's testimony, one can readily visualize a timid novice on the stand, who is offering too much cooperation to the cross-examiner in his attempt to be truthful; also at times, he is shown to be very confused by the intriguing cross-examination; it may be that the jury in whose presence the drama was unfolding, could perceive the difficulty confronting the witness in answering a cross-examiner he had difficulty in understanding. These human frailties of witnesses are taken into consideration by a jury and aid them immensely in deciding whether the cross-ex-

aminer has chipped away at the edge of the truth or merely at the brim of faithful recollection. The respective Justices of the Law Court, with only the printed word to guide them, may at times be shocked by the twisted ideas of fragmented sentences while a visual observation of the witness with consequent notice of his keenness or dullness of intellect, his calmness or uneasiness in disposition, would dress the discourse with more accuracy of interpretation and more certainty in meaning. A split second's mental sluggishness of the plaintiff in monosyllabic answers to two questions without full explanation of all possible avenues of intendment has caused him legal ruin at the hands of this Court; the jury, with 20/20 vision, was better able to focus upon the true picture and circumvent the abysmal error into which this court has permitted itself to fall.

The evidence, if viewed in the light most unfavorable to the plaintiff, was in some aspects conflicting, and the conflict had to be passed upon and solved by the jury. It was neither unbelievable, nor incredible, nor inconsistent with undisputed or proven facts. This Court might have reached a different conclusion than the jury did, had the case been submitted to it on the evidence in the first instance. In the judicial framework and constitutional concepts, we were never meant to be a second jury, and unless a jury verdict be obviously contaminated with prejudice, bias, passion or be manifestly wrong because of mistake of law or fact, it should stand without second guessing from us. Sanborn v. Stone, 149 Me. 429, 438, 103 A.2d 101; Hunt, Hersey v. Begin and Dow, 148 Me. 459, 460, 95 A.2d 818.

The best proof of this Court's obvious error in this case is the inconsistency of its present decision with that in Sansbury v. Gerrish, Me., 219 A.2d 539 filed May 6, 1966.

There was error in the court below. The jury verdict should now be re-instated. I dissent.